Nathan MARKSBERRY, Appellant,

v.

Warden Larry CHANDLER;  and
Lieutenant Larry Voirol,
Appellants.

No. 2002–CA–001920–MR.

Court of Appeals of Kentucky.

Oct. 31, 2003.

As Modified on Grant of Rehearing
Jan. 30, 2004.

Nathan Marksberry, Central City, pro se.

Rebecca Baylous, Frankfort, KY, for Appellee.

Before EMBERTON, Chief Judge; BAKER and JOHNSON, Judges.

## OPINION

JOHNSON, Judge.

Nathan Marksberry has appealed from an order entered by the Oldham Circuit Court on August 14, 2002, which dismissed his petition for declaration of rights filed pursuant to KRS[1] 418.040 challenging a prison disciplinary action. Having concluded that Marksberry has not shown that he possessed a liberty interest subject to due process protection, we affirm.

On May 13, 2002, Roy Cannon, Marksberry's cellmate at the Luther Luckett Correctional Complex, made an accusation to Corrections Officer, Lieutenant Hezzie Turner, that Marksberry had struck him on the back of his head with an unknown sharp object while they were in their cell. Cannon was taken to the prison medical facility for an alleged cut. After conducting an investigation that included interviewing several other inmates, Lt. Turner prepared a Disciplinary Form (Write Up and Investigation Section) charging Marksberry with violation of Corrections Policies and Procedures (CPP) 15.2, Category IV, Item 1, physical action resulting

in injury to another inmate. Lt. Turner also prepared a report containing confidential information that he had received during the investigation that was submitted to the Adjustment Hearing Officer. When questioned, Marksberry denied having struck Cannon.

On May 29, 2002, Lieutenant Larry Voirol, acting as an Adjustment Hearing Officer, conducted a disciplinary hearing at which Marksberry was assisted by an inmate legal aide. Marksberry called five witnesses to testify on his behalf, but his request to have Dr. Robin Sublett, a clinical psychologist at Luther Luckett who had been treating Marksberry, testify was denied. Marksberry sought to have Dr. Sublett testify on his alleged non-violent character and certain medication he was taking. The Adjustment Hearing Officer stated in the Disciplinary Report Form (Hearing Appeal Section) that he denied the request because Dr. Sublett had no direct knowledge of the specific incident at issue in the disciplinary action. Following the hearing, the Adjustment Hearing Officer issued a written report finding Marksberry guilty of the lesser, amended charge of violation of CPP 15.2 Category III, Item 11, physical action against another inmate, and imposed a penalty of 15 days disciplinary segregation.[2] The Adjustment Hearing Officer stated in the report that his decision was based on confidential information from more than two inmates that Marksberry had made threats to hit or cut Cannon for talking to other inmates or wanting to move to another cell, that Marksberry had been seen grabbing Cannon, and that Marksberry had threatened to hit other inmates for talking to Cannon. The Adjustment Hearing Officer also said the charge had been amended because the

---

1. Kentucky Revised Statutes.

2. The penalty imposed did not include the forfeiture of any statutory good-time credits.

nurse's medical report indicated Cannon had suffered no injury. Larry Chandler, the prison warden, concurred with the decision upon appeal by Marksberry.

On July 18, 2002, Marksberry filed a petition for declaration of rights pursuant to KRS 418.040 challenging the prison disciplinary action as a violation of his right to due process under the Fourteenth Amendment to the United States Constitution and Section 2 of the Kentucky Constitution. More specifically, he alleged the disciplinary decision was not supported by sufficient evidence because the confidential information was unreliable and Lt. Turner's report lacked credibility. Marksberry also objected to denial of his request to call Dr. Sublett as a witness at the hearing. On August 9, 2002, the Department of Corrections, on behalf of the appellees, filed a response and a motion to dismiss. On August 14, 2002, the trial court entered an order dismissing the petition on both procedural and substantive grounds. It held that Marksberry had not been deprived of a protected liberty interest, and alternatively, that he had received sufficient procedural due process. Marksberry filed a motion to reconsider, which was summarily denied. This appeal followed.

Marksberry contends that his right to due process was violated because (1) he was not given 24–hour advance notice or a 24–hour continuation to prepare a defense to the amended charge, (2) he was improperly denied the opportunity to call Dr. Sublett as a witness, and (3) the decision

was not supported by "some evidence" in large part because the confidential information was unreliable. Marksberry also maintains that he may bring a declaration of rights action under state law regardless of the existence of a protected liberty interest. Finally, Marksberry asserts that he did have a protected liberty interest because under CPP 15.3(VI)(B)(1), a decrease of five days meritorious good-time credit is mandated for conviction of a major violation of prison policies.

The trial court relied on the United States Supreme Court decision in *Sandin v. Conner*,[3] and held that Marksberry's right to due process was not violated because he did not have a constitutionally protected liberty interest. In order to prevail on a Fourteenth Amendment procedural due process claim, a party must establish (1) that he enjoyed a protected "liberty" or "property" interest within the meaning of the Due Process Clause, and (2) that he was denied the process due him under the circumstances.[4] A protected liberty interest may arise from two sources— the Due Process Clause itself and state law or regulations.[5] Challenges to prison conditions including segregation or removal from the general prison population are based on a potential "liberty" interest, but not all deprivations of an interest trigger the procedural safeguards of the Due Process Clause.[6] For example, disciplinary segregation typically does not implicate a liberty interest protected by the Due Process Clause itself because it is the sort of

---

**3.** 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

**4.** *See Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972); and *Franklin v. District of Columbia*, 163 F.3d 625, 631 (D.C.Cir.1998) (involving inmate subjected to segregation).

**5.** *See Kentucky Department of Corrections v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989); and *Bills v. Henderson*, 631 F.2d 1287, 1291 (6th Cir. 1980).

**6.** *See, e.g., Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Thompson*, 490 U.S. at 460, 109 S.Ct. 1904; and *Jones v. Baker*, 155 F.3d 810 (6th Cir.1998).

confinement an inmate can reasonably anticipate receiving.[7] On the other hand, in *Hewitt v. Helms*,[8] the U.S. Supreme Court analyzed the specific language of the relevant state statutes or regulations to determine whether a state-created liberty interest was created. The Court indicated that the use of language of a mandatory character such as "shall," "will" or "must" in addition to substantive predicates restricting the discretion of prison officials could create a protected liberty interest.[9] In *Sandin*, the Court shifted the focus of analysis for determining whether state law created a protected liberty interest in the prison setting to the nature of the deprivation in an attempt to restrict participation of the courts in the regular operations of prisons.[10] In addition to the existence of language guiding or restricting the discretion of prison officials, an inmate must now establish that the condition "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."[11]

In *Sandin*, Conner was placed in disciplinary segregation for 30 days for violation of a prison regulation. The Court held that Conner had not established a protected liberty interest because he failed to show atypical and significant hardship. It noted that Conner's confinement "did not exceed similar, but totally discretionary, confinement in either duration or degree of restriction."[12] The Court concluded that "[b]ased on a comparison between inmates inside and outside disciplinary segregation," Conner's placement in the special housing unit "did not work a major disruption in his environment."[13] In measuring whether particular restrictions imposed on inmates are atypical and significant, *Sandin* indicated that courts should look to factors such as the following: (1) the effect of the segregation on the length of prison confinement under the original sentence; (2) the extent to which the conditions of the segregation differ from other routine prison conditions; and (3) the duration of the segregation imposed.[14] While a determination of whether a specific situation constitutes "atypical and significant hardship" usually involves factual issues, the ultimate issue of atypically is a legal issue subject to *de novo* review.[15]

■ In the case *sub judice*, Marksberry received a penalty of 15 days disciplinary segregation with no loss of good-time credits. CPP 10.2 addresses the restrictions associated with the various categories of special management or special housing of inmates, including administrative control status, administrative segregation, disciplinary segregation, protective custody, special security, and temporary holding. Restrictions imposed under special man-

---

7. *See Torres v. Fauver*, 292 F.3d 141, 150 (3d Cir.2002).

8. 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983).

9. *Id.* 459 U.S. at 471–72, 103 S.Ct. 864; *Olim v. Wakinekona*, 461 U.S. 238, 249–50, 103 S.Ct. 1741, 1747–48, 75 L.Ed.2d 813 (1983).

10. *Sandin*, 515 U.S. at 480–82, 115 S.Ct. 2293.

11. *Id.* 515 U.S. at 484, 115 S.Ct. 2293. *See also Sealey v. Giltner*, 197 F.3d 578, 584 (2d Cir.1999); and *Rimmer–Bey v. Brown*, 62 F.3d 789, 790–91 (6th Cir.1995).

12. *Sandin*, 515 U.S. at 486, 115 S.Ct. 2293.

13. *Id.*

14. *See, e.g., Sandin*, 515 U.S. at 486–87, 115 S.Ct. 2293; *Resnick v. Hayes*, 213 F.3d 443, 448 (9th Cir.2000); and *Wright v. Coughlin*, 132 F.3d 133, 136 (2d Cir.1998).

15. *See Sealey*, 197 F.3d at 585; and *Beverati v. Smith*, 120 F.3d 500, 503 (4th Cir.1997).

agement include reduced canteen and telephone privileges, opportunities to shower and shave of not less than three times weekly, and opportunities to exercise outside the cell of one hour per day for five days a week. Special management inmates retain the same opportunities as the general population to meal service, access to barber and hair care, and receipt and sending of mail. They also retain some access to legal materials, reading and writing materials, and visitation. Importantly, as in *Sandin*, there does not appear to be differences in the conditions between the various special housing types. Furthermore, Marksberry has not alleged that the conditions he experienced were more onerous, harsh or restrictive than those applicable to inmates normally assigned to disciplinary segregation. With respect to the duration of the segregation, numerous cases have held that segregation for periods exceeding the 15 days served by Marksberry with harsher conditions than those imposed under the Kentucky CPP did not rise to the level of atypical and significant hardship.[16]

■ Marksberry complains that he suffered collateral consequences due to the disciplinary action such as an inability to complete a college course in which he was enrolled, transfer to a different prison making it more difficult for his elderly father to participate in visitation, inability to participate in various (unnamed) prison programs, loss of prison jobs, and loss of a particular cell. These effects appear to be associated with his transfer to a different prison following reclassification of his status resulting from the disciplinary action. We note that inmates do not have a constitutional right to a particular security classification or to be housed in a particular institution.[17] These collateral consequences affect privileges accorded to inmates that do not implicate a protected liberty interest.[18]

Despite the fact that the disciplinary penalty did not explicitly include a forfeiture of any good-time credit, Marksberry cites to CPP 15.3(VI)(B)(1) in contending that the disciplinary action impacted a protected liberty interest. CPP 15.3(VI)(B)(1) states:

B. Utilizing the anniversary date, the inmate shall be considered for an award

---

**16.** *See, e.g., Sandin,* 515 U.S. at 486–87, 115 S.Ct. 2293 (30 days in disciplinary segregation); *Sealey,* 197 F.3d at 585 (101 days in administrative segregation); *Griffin v. Vaughn,* 112 F.3d 703 (3d Cir.1997) (15 months in administrative segregation); *Smith v. Mensinger,* 293 F.3d 641 (3d Cir.2002) (7 months in disciplinary segregation); *Beverati,* 120 F.3d at 503 (6 months in administrative segregation); *Baker,* 155 F.3d at 810 (30 months in investigative administrative segregation); *Thomas v. Ramos,* 130 F.3d 754 (7th Cir.1997) (70 days in disciplinary segregation); *Portley–El v. Brill,* 288 F.3d 1063 (8th Cir.2002) (30 days disciplinary segregation); *Williams v. Goord,* 111 F.Supp.2d 280 (S.D.N.Y.2000) (75 days in disciplinary segregation); *Luis v. Coughlin,* 935 F.Supp. 218 (W.D.N.Y.1996) (33 days in administrative segregation); *Bruns v. Halford,* 913 F.Supp. 1295 (N.D.Iowa 1996) (90 days in administra-

tive segregation); *Stone–Bey v. Barnes,* 913 F.Supp. 1226 (N.D.Ind.1996) (365 days in disciplinary segregation); *vacated and remanded on other grounds, Stone–Bey v. Barnes,* 120 F.3d 718 (7th Cir.1997).

**17.** *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976); *Mahoney v. Carter,* Ky., 938 S.W.2d 575 (1997).

**18.** *See, e.g., Thomas,* 130 F.3d at 762 (collateral consequences not imposing atypical hardship include loss of ability to take classes, use the gym, prison employment, access to "day room," or take programs offered to general population); and *Gaston v. Taylor,* 946 F.2d 340 (4th Cir.1991)(en banc)(changes in location, variations in daily routine and denial of privileges are matters within discretion of prison management).

up to[ ] sixty (60) days for the previous twelve-month period[:]

> 1. There shall be a decrease in the amount of time awarded by five (5) days for each month in which a conviction of a Major Violation is received.

Marksberry asserts that since the mandatory language in subsection (B)(1) requires prison officials to deduct five days good-time credit for a conviction of a major violation of prison regulations, the disciplinary action impinged on a protected liberty interest under *Wolff v. McDonnell.*[19]

Marksberry's position is flawed for several reasons. First, he mischaracterizes the type of credit to which CPP 15.3(VI)(B)(1) applies. CPP 15.3 involves *meritorious* good-time, not *statutory* good-time. Under KRS 197.045(1) prisoners generally receive ten days good-time credit for each month served for good behavior. In addition to this statutory good-time, KRS 197.045(3) provides for good-time credit not to exceed five days per month for meritorious service to be awarded by the Corrections Commissioner *at his discretion.* This distinction is important because statutory good-time typically is automatically awarded absent bad behavior, while meritorious good-time is awarded only upon an affirmative decision and action by the Commissioner. Under CPP 15.3 an inmate must be recommended for meritorious good-time and the Commissioner has discretion whether to make an award.

While the specific factual situation in *Sandin* concerned the conditions of confinement, the Court reaffirmed and drew from its prior decision in *Wolff,* which involved the length or term of confinement. In *Wolff,* the Court clearly stated that the Due Process Clause itself did not create a liberty interest in good-time credit for good behavior.[20] The Court held that where a state has created a right to good-time credit that shortens the prison sentence and provides that the credit is revocable only upon the inmate's serious misconduct, he has an interest of "real substance" subject to procedural due process protection.[21] The *Sandin* Court also reaffirmed the principles discussed in *Meachum,*[22] which expanded on the analysis defining a liberty interest in the context of prison transfers. In *Meachum,* the Court held that in contrast to the mandatory provisions in the · Nebraska statutes and prison regulations in *Wolff,* the Massachusetts law did not create a protected liberty interest because it gave prison authorities discretion over the transfer of prisoners. Apparently in recognition of the principles espoused in *Wolff* and *Meachum,* the *Sandin* Court indicated that in order to establish atypical and significant hardship due to a disciplinary action with respect to the term of confinement, an inmate must show the "State's action will *inevitably* affect the duration of his sentence" [emphasis added].[23] In other words, an inmate must show an actual impact on the duration of the original sentence and not just a "possibility" of early release.[24]

19. 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

20. 513 U.S. at 564 n. 6, 115 S.Ct. 1061.

21. *Id.* at 556, 94 S.Ct. 2963.

22. 427 U.S. at 215, 96 S.Ct. 2532.

23. *Sandin,* 515 U.S. at 487, 115 S.Ct. 2293.

24. *See, e.g., Zimmerman v. Tribble,* 226 F.3d 568 (7th Cir.2000); *Malchi v. Thaler,* 211 F.3d 953 (5th Cir.2000); *Bulger v. United States Bureau of Prisons,* 65 F.3d 48 (5th Cir.1995); *Marino v. Klages,* 973 F.Supp. 275 (N.D.N.Y.1997); and *Cardenas v. Wigen,* 921 F.Supp. 286 (E.D.Pa.1996).

A careful review of CPP 15.3(VI)(B)(1) indicates that Marksberry's reliance on that provision to establish a liberty interest is misplaced. Although subsection (B)(1) uses mandatory language calling for a decrease in the amount of meritorious good-time to be awarded for conviction of a major disciplinary violation, that consequence must be read in relation to subsection (B) as a whole, which concerns the annual eligibility review. The same rules of construction or interpretation that apply to statutes also apply to administrative regulations.[25] Each section of a statute (or regulation) should be interpreted consonant with the statute as a whole.[26] Subsection (B)(1) provides for a decrease of one-twelfth of the yearly amount of meritorious good-time for which an inmate is eligible for each month in which he receives a conviction for a major violation of prison regulations. In other words, the disciplinary violation reduces the amount of meritorious good-time that possibly *could* be awarded; it does not affect meritorious good-time *already* earned or awarded.[27] Because the decision whether to award meritorious good-time in the first instance is totally within the discretion of the Commissioner, a claim to any specific amount of meritorious good-time and loss due to a reduction in the amount an inmate is eligible to receive is purely speculative. The loss of the mere opportunity to earn good-time credit does not constitute a cognizable liberty interest.[28] In addition, CPP 15.3(VI)(B) indicates that an inmate shall be considered for an award "up to" 60 days, but CPP 15.3(VII)(E)(3) states that prison personnel, "shall use discretion in determining if all or a portion" of the maximum eligibility amount is submitted to the Commissioner for approval of an award. Thus, Marksberry has not shown a protected liberty interest in meritorious good-time in that the disciplinary action caused atypical and significant hardship by inevitably affecting the duration of his original sentence.

Finally, Marksberry asserts that the trial court erred in dismissing his petition based on *Sandin* because he had a separate cause of action for violation of due process under state law. Marksberry states that he need not establish the existence and infringement of a liberty interest in order to state a claim under state law. This issue was not properly preserved. It is a matter of fundamental law that the trial court should be given an opportunity to consider an issue, so an appellate court will not review an issue not previously raised in the trial court.[29] Similarly, "an issue not properly raised in an intermediate appellate court may not be raised on appeal to the next higher court" [citation omitted].[30] Marksberry has raised this is-

25. *SmithKline Beecham Corp. v. Revenue Cabinet*, Ky.App., 40 S.W.3d 883 (2001); *Aubrey v. Office of Attorney General*, Ky.App., 994 S.W.2d 516, 520 (1998) (quoting *Revenue Cabinet v. Gaba*, Ky.App., 885 S.W.2d 706, 707 (1994)).

26. *Id.; Combs v. Hubb Coal Corp.*, Ky., 934 S.W.2d 250, 252–53 (1996).

27. *Compare* CPP 15.3 (VIII)(C) providing for forfeiture of meritorious good-time on a conviction for violation of disciplinary regulations.

28. *See Luken v. Scott*, 71 F.3d 192, 193 (5th Cir.1995); and *Abed v. Armstrong*, 209 F.3d 63, 67 (2d Cir.2000).

29. *See, e.g., Commonwealth v. Maricle*, Ky., 15 S.W.3d 376, 379 (2000); *Swatzell v. Commonwealth*, Ky., 962 S.W.2d 866, 868 (1998); and *Commonwealth v. Lavit*, Ky., 882 S.W.2d 678, 680 (1994).

30. *Personnel Board v. Heck*, Ky.App., 725 S.W.2d 13, 18 (1986). *See also Goben v. Parker*, Ky.App., 88 S.W.3d 432, 433 (2002) (failure to preserve issue in petition for declara-

sue for the first time on appeal in this Court. Both his extensive petition for declaration of rights and motion for reconsideration cite to and rely on federal law. As a result, he has failed to properly preserve this issue for appellate review.

For the foregoing reasons, the order of the Oldham Circuit Court is affirmed.

ALL CONCUR.

tion of rights challenging prison disciplinary action precluded review on appeal from the

circuit court).